The Pleas of Court, my name is Preston Easley. I represent the Plaintiff Appellant in this action, James Flowers. Ordinarily, I wouldn't be so presumptuous as to appeal a lower court decision by the trial judge, but I believe there are certain issues in this particular case. The decision is one thing, but this case went to trial. That's right. What is clearly erroneous, exactly? A number of things, Your Honor, both factually and legally. I'll start off with one of the factual errors, and that is that we had an expert testify about the ASTM marine safety standards, which is a widely recognized maritime safety standard. Hold on. In order to understand you, I need you to hit it in a different order. Start with the finding of fact by the magistrate judge, and then tell me why it's clearly erroneous. The finding of the magistrate judge is there is no negligence and no unseemlyness. Which finding are you looking at now? The reason I'm asking this, it looked to me like a case that could go either way, and it went that way. There's evidence going both ways. I'm just not clear on exactly why there's a clearly erroneous finding or an error of law that compels reversal. Well, I can explain them, Your Honor. There are 16 pages of findings by the trial judge that basically lead to the same conclusion, that there was no negligence or unseemliness. And there are just about three or four of them that I would like to address. It looks like 16 is the critical one. And 15. And I'm prepared to discuss the second 15. I didn't have my argument metered to those two findings, but those two findings are exactly consistent with what I'm going to argue. If I may proceed. First of all, the judge is basically saying there's nothing unusual about this, there's nothing unsafe about it, in so many words. There's a number of things that were unsafe about it and that the vessel had knowledge were unsafe about it. First of all, the defendant's expert testified that the amount of line that had to be pulled through the hole, which is a hole in the side of the hull of the ship, was 165 pounds. I'm sorry, 168 pounds. We introduced expert testimony and ASTM maritime standards to say the maximum safe pulling weights are 110 to 165 pounds. I find it very hard to understand what we're talking about. Is it that the whole rope weighs 168 pounds or that it takes... That's the pulling force. Because there's 35 feet of rope going back out and it's connected to a barge and you're in sea conditions and you're pulling that rope through that little hole. And it's as if you're pulling something that's 168 pounds? According to their expert, yes, Your Honor. According to their expert, their human factors expert, Wilson Hayes, testified to that effect. Our expert testified it was more, something in excess of 200 pounds that you were pulling. He testified 168 on the other side. Giving the defendant the benefit of the doubt, I'll go with the lower calculated pulling weight. I don't actually see why that mattered all that much. I mean, people push a car out of a ditch all the time and it weighs maybe 4,000 pounds. You're not lifting the car, you're just pushing it out of the ditch when it gets stuck in the snow. A car has a dead battery, people push it to get it going to a hill where it can roll down. Gosh, if I park so I can't close my garage door, I push the car so I can close it, just put it in neutral. Pulling on a rope is not the same thing as lifting. True, this guy, I think he bench presses 300 pounds. But pulling 165 pounds through the water is not nearly as hard as lifting 165 pounds. The testimony I gather is that the rope weighed 168 pounds, it weighs a lot more than that, doesn't it? I think the rope weighs less than that. The rope was about 35 feet long, it's about 8 inches in circumference. And what I believe is that it weighs less than 168 pounds, but the friction and everything of pulling it through that hole is what gives it the greater weight. Actually, what it says here is that it weighs 168 pounds. The force that's being put, you can have a pulling force. In other words, it makes sense to say that it takes, in certain circumstances, 200 pounds of pushing force to move a 4,000 pound car. I mean, you can measure that. Now, the testimony that it's 168 pounds refers to what? That was the pulling force that their experts said would be required to pull that 35 feet of line through the hole in the side of the boat. And that was his testimony, which was a lower number than our expert came up. There are extenuating factors. Number one, like I said, that exceeds the safe allowable limits in the ASTM maritime standards that went into evidence. My understanding of the district judge's finding was that it wasn't 168.5 pounds of pulling weight. She didn't really take issue with either of the experts as to what would have been the case had their pulling weight been correct. But what she said was that Taren Hall's understanding about the weight of the line was incorrect because of the kind of rope it was, and that Woods testified that taking up the slack in the spring line does not involve pulling tension, as he's just pulling up the available slack. In other words, she had a different understanding of what was actually happening here. She didn't think that he was pulling 168 points with a tension of 168.5 pounds because he was only pulling up the slack. Now, is that clear? That kind of cuts loose of the expert testimony because it suggests that both of the experts were testifying about a different pulling task than the one that went on here. Is that clearly erroneous? It doesn't make any difference. It's 35 feet of line connected to a barge that's coming to a boat. But what she's saying is they weren't pulling the 35 feet of line. They were pulling a little piece of it by pulling up the slack. That's my understanding of what she's saying. It's like you have a rope that's going like this. You're just pulling a little turn of it. You're not pulling the whole rope. That's incorrect, Your Honor. But that's what she said, right? What the whole procedure is is it's a jackknifing procedure where the tug is towing the barge. Tug reverses course, puts itself side up against the barge, and then brings all the lines between the tug and the barge completely tight. So there's no just pulling a little bit of line. This was a line that was going off the bow of the tug. So you're saying that she was clearly erroneous. Absolutely. Woods testified that taking in the slack of the spring line as it comes out of the choke hold does not involve pulling any pulling tension, as the person is just pulling up available slack in the spring line. Did Woods say that? I disagree with it. I'm asking, did Woods say that? She said that Woods said that. Did he say that? Woods testified that it took 168 pounds of force to pull that line through the hole. Who was Woods? I thought Woods was the captain. Woods was the human factors expert for the defendant. And he's the one that testified that it took 168 pounds of pulling force to pull that through. And so I'm giving the defendant the benefit of the doubt by and I'll see if I have an exact cite to that amount. I'm sorry. Mr. Hayes, Wilson Hayes. Right. And I wasn't talking about Mr. Hayes. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm using the wrong word. Wilson Hayes, their expert, testified that the force required to pull the line was 168 pounds. That's transcript volume four, page 36. But the district court essentially didn't believe that that was what they were doing here. She said that Woods, who I guess was the captain, I'm not sure about that, said that they weren't doing that. They were only picking up the slack, so they weren't pulling 168.5 pounds. That's what her, in other words, she essentially disregarded, as I understand it, both of the experts because they were testifying about a task that didn't occur here. I think Woods was their tugboat captain safety expert. He didn't do any kinds of calculations. His was just sort of a shoot-from-the-hip testimony that he didn't think it would be that hard. And she chose to credit him. So the question is, was she not entitled to do that? I'm just trying to center on the issue here, which is, was she clearly, did he say that? And if he did say it, is there some reason she was clearly erroneous in relying on him? I would like to respond to that on my second call because, like I said, they put on this highly talented human factors guy who did extensive calculations that said it was 168 pounds of pull. If you want to take some time to think about it while we hear from the other side, just be sure to reserve yourself enough. I had the same reaction that none of this expert's business mattered much because the judge was persuaded they were just pulling in slack on what was essentially a dry line. It's constructed not to be highly absorbent. It's 35 feet long and it's 8 inches in circumference. It's hard to even get your hands around a line that large. My client testified it was an awkward position to try to pull the line in. I've shown photographs of the hole, which is down very low to the deck. My client's... You understand, we just can't do this the way we would if we were a jury or if we were the triers of fact. I have a total of 20 minutes, correct? You've got 7 minutes and 44 seconds left. Okay, and my client had two prior back injuries at this company. He had a pre-employment physical that had a stamp on it that says he was susceptible to back injury. He had asked to put power to the capstan. The capstan refused. It's my position that no person had greater knowledge of the plaintiff's own physical condition than the plaintiff himself. It's my position when the captain refused his request to go down to the engine room to activate power to the capstan, which pulls the line in on the bow, that the defendant then took responsibility for whatever happened after that. I cited numerous, numerous cases where a seaman requested assistance. It was denied and the defendant was found liable. Captain McCardle, the vessel's captain, was unfamiliar with the vessel. This vessel was not usually used in trial and it was normally used on the long run. Did the district judge make a finding as to whether he actually did ask for assistance? I couldn't hear you, Your Honor. Did the district judge make a finding as to whether he did ask for assistance? I would have to go back and read through the judge's decision, I'm not sure, but there was extensive testimony to that effect that he did ask for permission to go turn. And what did the captain say? Captain said in his deposition he didn't remember it. In the trial, the captain testified that the capstan was not functioning, but they always use it when it's working. So the captain gave about three different versions of why the capstan wasn't used. They normally sailed with a six-man crew, they were sailing with a five-man crew. Two men were on the barge. That just left the captain driving, my client, and an oiler. It really takes three people to pull this line. Two to pull it and one to take the slack out and put it in figure eight so people don't step on it. Or if you have a capstan running, you have two people on it feeding and pulling it off the capstan. When the capstan was originally asked in the trial why he didn't put three men on the line, he said because there's not that many men on the boat to be doing that. If you're to believe the capstan that there weren't enough men. I guess there was testimony to various things, and what the judge found, as a matter of fact, was that it's customary in the industry to use two men to do this job. I can't comment. I don't know how... That's what she said, isn't it? I'll have to double-check that, Your Honor. I mean, one tugboat expert testified on the other side. I don't know that he's representative of the entire tugboat. I understand that the standard that we have to apply is to see whether there was evidence that supported what the judge said, not whether there was evidence that countered it. When the captain was asked, Captain McCardle was asked, whether it was wise for one man to pull the line, he says, I guess it would depend on the individual. When he was asked whether it was a good idea for a man with a bad back to pull the line, he said, probably not a good idea. When my client asked him to go down below to the engine room and activate the power of the winch, he said, there's no time, go down onto the bow. And I would like to reserve my time to look at Wood's testimony. Thank you, Counsel. May it please the Court, I am Robert Frame, a Frame form being obtained from Honolulu. I think the Court, in its questioning of Plaintiff's Counsel, has correctly set forth the standard that must be applied, and that is deference to the factual findings of the trial court, who heard all of the evidence, judged the demeanor of the witnesses, assessed their credibility. Could you deal a little bit with this business about the experts and the 165 pounds versus the 200 and some pounds and how that plays into what the judge has concluded? I think what the judge did, but we can only speculate because she never mentions either one of these experts in her opinion. The one expert that Plaintiff's Counsel relied upon was a naval architect. The ATS standards he was referring to are design criteria. Dr. Hayes was an ergonomist and a human factors expert, and he, at great length, set forth how pulling the slack out of this spring line put virtually no pressure on the back. And I don't know if she just said, I don't care about this because the standards in the industry are two men. The red herring here is that, I mean, it's something we have to address. Who testified to that? Who testified? Captain Woods and Captain McArdle. They were both experienced tugboat captains. Captain Woods was an expert brought in. She gave him a great deal of credibility, you'll see in her findings of fact, because he wasn't affiliated with either party. It's odd. Was there testimony about what typically happened on this ship, on this boat? The testimony was that they always used two people at that bit, and this is a red herring. Even had there been a sixth crew member, which is a big issue in their brief, if you recall, the testimony, uncontradicted, was that that extra man would have then been down doing what the chief engineer was doing on this time, and the chief engineer would have been up in a wheelhouse drinking coffee with the captain. So, you know, it's a red herring. Five or six people, the operation is exactly the same. There would never have been a third person down there. It's not necessary. He'd be in the way. As the slack was being brought in, it goes down and coils up on the deck, and then it's wrapped around an H-bit so you have security so that later the tug can pull that slack out of the spring line, which runs fore and aft, but it's not necessary to give it any sort of a tension. The use of the capstan is another red herring because even the plaintiff at trial testified, and I've referred to it in my brief and given you an excerpt from the transcript, which I noticed I couldn't find in many instances in the other brief, but even he testified, as everybody else did, you never use the capstan if you're bringing your spring line in through the chalk where it was or over the side and taken to the hip bit or the H-bit, which is where the spring line is normally tied off. It's always done by men, and the reason is, and this was testified to by our naval architect, a world-renowned naval architect by the name of Larry Greif, that there was not a proper fair lead from the chalk to the capstan drum, and if, in fact, the line had been placed on that drum, it would not have been, as is done with the fore line. It comes straight in through the bullnose and wraps nice and smoothly around the drum. It's perpendicular to the axis of the drum. If you bring it in from this chalk, which is where the spring line was being brought in, it puts that line on that drum at an angle, and almost invariably it's either going to slip off or the rim of the drum is going to cause friction and weaken that line. It might part. Do we have to get to all that? No. As I remember, what the judge said was, a capstan isn't used because on this super-duper fancy synthetic line, the friction will cause burning damage to the line, and it's customarily done by two men, one pulling it in and one wrapping it around the H-bit. That's exactly right. Is that? Industry standard. And that's not clearly erroneous? We can just go with that? That's exactly right. Could you tell me where your expert said that there's virtually no pulling force in this situation? Yes, I can. I put a supplemental excerpt of record. Yeah, we've got it. His testimony was virtually the same as this. Well, it's many pages, single space. I was hoping I could underline. I wish I could pick it out. But it's the pulling force versus the effect of the pulling. I know what it is. I know what it is. What I'm looking for is just what I should underline. But it doesn't look like you can help me there. I'm sorry. I couldn't. He testified live, too, didn't he? Excuse me? Did he testify live? Oh, yes, he did. Yes, he did. He testified live. Was it in his oral testimony? Excuse me? You happen to have a page number for where it was in his oral testimony? I believe it's in my brief where he said basically there's not much pulling force involved in pulling in the slack. Synthetic line. Actually, it's it's I don't. And I'm sorry I did not address that. But the reason I didn't is because obviously the trial judge heard all of that testimony and then didn't rely on it in her opinion. So what she relied upon were factual findings, many of which were contested. And she judged credibility. And she believed one witness and not another witness. She went with the captain who said it's a two-man job, always is a two-man job. You know, so where the caps stand for good reason and there's nothing for a third man to do. That particular captain has been captain on tugs all over the western United States in every type of situation. And he says when you're dealing with a spring line, two people do it. And that's it. Just to back up for a second. You said in the beginning that the statement about the hundred and sixty five pound limit of force was a design standard. Right. It's actually and that's in my brief. It talks about it's the force required to get a stationary object moving. You hit right on it, Judge Gamby, when you said it might take that kind of force to get a large thing like a car moving. But it really had nothing to do with the pulling in right into your stomach, which, by the way, he testified to. It results in almost no pressure on the back, which is the important thing here. Now, I'd like to address one more thing because I think it's important. And that is this business about the plaintiff knows better about his physical condition than somebody else. Well, the court found that he never warned anybody. So therefore, if he didn't complain or say this is dangerous, then company captain, nobody would know that there was a risk involved because this is the only guy to get injured in this way. Industry wide, everybody does it like that. So there's no notice and no foreseeable risk. And that is that's clear in her findings. And perhaps like I was going to say, regarding his back and him knowing better than anybody, his own doctor who was brought in to testify specifically for trial, he wasn't even a treating physician, but he reviewed the records, reviewed the x-rays and said that there was nothing wrong with this man's back prior to this accident. Now, the plaintiff's counsel relied upon a 1990 pre-employment physical that was 11 years before this accident that said there may be a possibility in developing problems in the future. In point of fact, he sailed for the next 12 years. He had two minor back problems which were treated and he returned to work at the time of this injury. In addition to his doctor saying there was nothing wrong with his back and he wasn't suffering any symptoms prior to the accident, we also have a fit for duty slip which is required. So he's been seen by doctors every time he sails. They're routinely sent out for physicals. And I can tell you that this didn't come out in testimony, but working on board tugs, you're going to get a sore back once in a while because it's heavy work. But that doesn't relate to somebody who's entitled to special deference or something, especially when he had a fit for duty slip. And again, if the court's at all concerned about the six man versus five man, the Coast Guard regulations or the certification says five is fine. His union says five is fine. So I would ask this court not to substitute its judgment over that of the Coast Guard who's charged with setting manning levels or the union. Negotiation was it doesn't matter. It would just be another man to drink coffee while the two guys are working on a slack. That's right. It's exactly right. And that was testified to. And I think the court even mentioned that. And she doesn't mention it in her findings. I think the court needs to be guided by what I believe to be the guiding case in the Ninth Circuit, which is Exxon versus Sofec. Judge Canby sat on that panel. My firm tried it and Judge Hofstetler argued it here. And there were some serious attacks on the trial judges, factual determinations regarding the negligence of the captain after the vessel broke loose from its moorings. And his determination that it was superseding intervening cause because it was extraordinary negligence and a bunch of other things. But there was, again, Judge Fong decided that case. And that case went on for weeks and weeks. And there was lots of expert testimony, testimony from the people on board the vessel and other vessels that witnessed the thing. The judge listened to them all and made his factual determinations based upon what he decided was the most credible evidence. And this court upheld him. It struck me reading the record here that this man would almost certainly be entitled to maintenance and cure. I couldn't see any reason he wouldn't be. Did he get it? He got it, every penny. Unless you have other questions for me, I think I pretty much covered it. Let me, if I could, take a quick glance. I think I've covered all the points that I think are relevant to the court's findings. And I think we urge this court to uphold her findings because there is no way that anything that she put down in that opinion could be considered to be reversible error. Thank you, counsel. Thank you. I'm ready to answer what I couldn't answer before. This Captain Woods on page 3-177 of the trial transcript. And I know exactly what he's talking about. The no-pull method. There's a way to do this with nobody pulling any lines. Okay? That's not how it was done this time. But there is a way to do it. There's some trick way where the captain goes way up on the barge, sets the line, then throws the tug in reverse, then lets the lines pay out, and let them all go taught on their own through the relative motions of the vessel. That's true. That's another way of doing this operation. And on page 3-177 of the transcript, that's the exact procedure that this Captain Woods described. This procedure that was not used on the day of the accident. But if the panel were to ask me, can this be done with nobody touching anything, you bet it can. There is a trick way to do it with the relative motion of the tug and the barge. That wasn't done on this day. This was a manually pull that slack through the closed chalk on this thing. It's a different story. So are you saying that the district court judge, the magistrate judge, misunderstood what was happening? They must have misunderstood that, right. And while all of you were talking and you asked me to go find the place where Captain Woods says it didn't take any pulling, I ran back, I read his entire testimony, and immediately, like lightning hit me in the head, I remember, because even before he testified, I knew that there was a way to do this without anybody touching any lines. But the question, of course, would be whether, even though there is an alternative way where nobody touches a line, whether it's unsafe to do it the way it was done. Right. Well, I'm just addressing the panel's question about where did we get to this testimony by Captain Woods that a baby could do it, so to speak. And there is a way that a baby could do it where you hook up the lines and then you let the tug move back from the barge and you do it by the relative motions of the vessels. That wasn't done here. That's where that interpretation came from. I only want to address two other issues. One is warning. My client went up. He said, hey, do you want me to go down below and activate the power of this capstan? He obviously felt it was needed. He was told, no, we don't have any time. Get down on deck. He was following orders at that time. The third point I want to make is this concept of custom and practice is baloney. It has nothing at all to do with this case. You have to take into account the physical limitations of the seaman. I even cited a case in my briefing here, and I can't remember which one it was. I think it's the Lunsford case. It's the lady steward that has to go around the ship making up the bunks, and she's not tall enough to make up the highest bunk, and she gets hurt. And negligence and unseaworthiness are found. So the fact that you do an average weightlifting of the whole fleet and you come up with the average amount of weight that some guy can lift, that's not the standard of care in a seaman's action. And, you know, I also quoted in my brief, which is on the other table, but I already know what it says. It's a big section on page 18 or 19 of my opening brief from the Supreme Court, how seamen are expected to often follow orders that they don't agree with and that don't seem prudent to those seamen. You're over time. And that the courts are supposed to not give an overly narrow interpretation to this concept of negligence. It says the courts should avoid giving negligence a narrow, restricted, and technical meaning. So I'm just saying this Lunsford case about the short lady making up the bunks, that debunks this whole thing of custom and practice and how strong the average seaman is. You have to meter the work and make it safe for the person that's working for you. Thank you, counsel. Thank you. Flowers v. Salsey Brothers is submitted. We'll take a ten-minute recess before we do this, Wallace.
judges: Canby, Kleinfeld, Berzon